UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| WARREN L. ELLIS, SR., | : | Bankruptcy No. 05-39345DWS |
| | : | |
| Debtor. | : | |

## MEMORANDUM OPINION

**BY: DIANE WEISS SIGMUND, Chief Bankruptcy Judge**

Before the Court is (1) the Motion of the Chapter 13 trustee (the "Trustee") to dismiss this Chapter 13 case (the "Motion") and (2) Debtor's request for confirmation of his Amended Chapter 13 Plan. ABN-Ambro Mortgage Group, Inc. (ABN") supports the Motion and opposes confirmation as does the Trustee. The Motion was filed on the heels of an Opinion and Order, In re Ellis, 339 B.R. 136 (Bankr. E.D. Pa. 2006) ("Ellis I"), denying Debtor's Motion to Extend the Automatic Stay ("Stay Motion") which had also been opposed by the Trustee and ABN. While the relief being considered in the Stay Motion was different, the issue that is central to this Motion is the same, i.e., confirmability of Debtor's Chapter 13 plan. Although Debtor amended his plan after the adverse ruling on the Stay Motion, his amended plan is based on the same two-prong strategy I reviewed

in connection with the Stay Motion: (1) the prosecution of an adversary proceeding (the "Adversary") that, if successful, would allow him to regain ownership and reinstate ABN's secured claim and (2) payment of the resulting ABN claim with proceeds of his deferred compensation account with the City of Philadelphia.

**BACKGROUND**

On November 21, 2005, Debtor filed this third Chapter 13 bankruptcy case. His bankruptcy history and most of the facts relevant to this case have been set forth in Ellis I and will not be repeated here except as necessary for clarity.[1] At this hearing Debtor testified again regarding his efforts to raise the funds necessary to satisfy ABN's claim if he is successful in avoiding the sale of his residence at 425 W. Abottsford Avenue, Philadelphia, PA (the "Property") pursuant to the Adversary. At the initial Stay Motion hearing on December 13, 2005 Debtor testified that the procedure used by the sheriff to sell the Property on November 1, 2005 failed to recognize the bid of his brother who had sufficient funds to be the prevailing bidder.[2] Taking Debtor at his word that had he been given the chance he could have saved the Property by purchasing it at sheriff's sale, I secured a commitment from

---

[1] I find that Debtor is bound by my findings set forth in Ellis I to the extent they are not controverted by new evidence that has been presented in this separate proceeding. Given the lengthy opinion written, I will not repeat those factual findings or the conclusions I drew from them but rather will incorporate Ellis I as if set forth in full.

[2] Contending that this "irregularity" presents grounds to apply the exception in BFP v. Resolution Trust Co., 511 U.S. 531, 114 S.Ct. 1757 (1994), Debtor filed a complaint to set aside the sale as a fraudulent transfer.

ABN that he be allowed to do so by tendering full payment, i.e., $78,000, in thirty days, the time Debtor stated would be necessary to access the funds. At a follow-up hearing on January 17, 2006, I learned that he had failed to do so. Debtor explained that he contemplated liquidating and using his deferred compensation account ("Plan Funds") established under a plan (the "Plan") made available to City of Philadelphia employees and that he had not known that the withdrawal process requires the submission of a hardship letter and a six to eight week wait for Board approval. He testified that he had submitted the hardship letter on December 21, 2005 but had no copy. While he did not have a current statement of his Plan Funds at the January hearing, he has since acquired a letter from the administrator of the Plan that states that Debtor has applied for an unforeseen emergency withdrawal ("UEW"), his paperwork is currently being reviewed and his account balance is $91,852.32 as of March 29, 2006. Exhibit D-2.[3]

At the March hearing ABN's counsel sought to further probe the status of Debtor's efforts to gain access to the Plan Funds. Debtor stated that he did not know whether he had to own the Property in order to get approval of his hardship application. He acknowledged that he was required to supply certain documentation, including a letter from a mortgage company that he could not get a loan and proof of the obligation to ABN, and claimed he had done so. When asked to provide copies of all the documents he submitted in support of his

---

[3] In Ellis I, I found that Debtor had not proven the balance he claimed because the statement was not current and more significantly his Schedule B filed under penalty of perjury reflected $4,000 of Plan Funds as of November 21, 2005, not the $80,000 he testified to on December 13, 2005. 339 B.R. at 143.

request, he produced Exhibits D-3, D-4, D-5 and D-6.[4]  Exhibit D-3 is the uncontested amended judgment in favor of ABN dated October 24, 2005 in the amount of $71,518.82 plus interest to the date of sale.  Exhibit D-4 is a two form letters from ABN dated December 16 and 25, 2005 sent to all residential mortgage customers regarding the loss of a computer tape containing customer data and its subsequent recovery.  Exhibits D-3 and D-4 have nothing to do with the information sought by the Plan.  Exhibit D-5 is a letter dated February 24, 2005 from Indy Mac Bank FSB advising Debtor that it had reviewed his mortgage application to determine whether it would purchase the loan from the originating lender and had declined but stating that the notice did not mean the actual loan application which is submitted to the lender, has been denied.  Exhibit D-6 is a binder for homeowner insurance dated February 17, 2006 on the Property.  Debtor acknowledged that in securing the coverage, he falsely represented himself to own the Property.

Absent from this document production was a copy of the hardship letter which he now states he submitted in February when he was provided with the check list of documentary requirements.[5]  Exhibit D-7.  He also claims that he has completed the application contained in Exhibit D-7 and has submitted it to the Plan with his notarized signature.  He had no copy of the signed application.  He further states that he supplied all the documents on the check list on February 16 or 17, i.e., his most recent tax return, two pay stubs, a statement from

---

[4] It took two breaks in the testimony for him to review his file and produce the submitted documents, all of which he stated he had with him.

[5] At the hearing on January 17th, Debtor testified that he submitted the hardship letter with his request for funds on December 21, 2005.  At the hearing on March 30, he stated that he made his request for the Plan Funds in February 2006.

-4-

a bank verifying approval or denial of a loan request which he identified as Exhibit D-5 and the signed UEW acknowledgment which he stated was same as the hardship letter. There was no copy of a cover letter transmitting any of these documents. None of the documents allegedly supplied would indicate that Debtor does not own the Property.

On further examination Debtor indicated that at the time of the January hearing he had five or six mortgage applications and liquidating the Plan was "the last thing he wanted to do." He stated that he has a pending mortgage agreement and would hear in the next two to three days whether it was approved. To evidence that pending agreement, he produced Exhibit D-8 which is a completed internet mortgage refinance application to Franklin Financial Mortgage Corporation with a header date of March 27, 2006. No acknowledgment of receipt of that application was produced.[6] That document fails to indicate that Debtor does not own the Property; rather it represents that he has a mortgage of $485.00 per month. Id.

To presumably attempt to cure the deficiencies in the Chapter 13 plan as noted in Ellis I, Debtor filed an Amended Chapter 13 Plan on March 7, 2006 (the "Chapter 13 Plan"). Exhibit D-1. The principal change relates to Debtor's undertaking if he is successful in avoiding the sheriff's sale and reinstating the mortgage. Now rather than intending to pay ABN currently and cure arrears over the life of his Chapter 13 Plan (when he obviously does not have the disposable income do to so as noted in Ellis I, 339 B.R. at 144), he commits to "liquidate the entire rightful balance through a withdrawal from his deferred compensation plan from the City of Philadelphia and/or the proceeds of a loan." Id. ¶ 3.

---

[6] In other words, there is no evidence that Debtor hit the "submit" button.

**DISCUSSION**

I begin this discussion with Debtor's request for confirmation of his Chapter 13 Plan because if it is not confirmable and it does not appear that any plan can be confirmed in a reasonable time, this case should be dismissed pursuant to § 1307. As noted above, the confirmability of the Chapter 13 Plan depends on both a successful outcome in the Adversary and the tendering of funds to pay ABN's claim in full. In Ellis I, I explained at some length the reasons for my dim view of the merits of the Adversary. I affirm that conclusion, and will rely on that opinion without repeating it herein. See Ellis, 339 B.R. at 142-43. While it is obviously not my intention to rule on the Adversary which has not been tried, I will not defer a decision on confirmation and the Motion pending its outcome given my conclusion that it is unlikely to be successful and more significantly, success in the Adversary will not lead to success in this case. Debtor naturally seeks to defer matters until the case can be tried, if for no other reason than the delay allows him to continue his rent-free occupancy of the Property he no longer owns.[7]

The Chapter 13 Plan is fatally flawed without regard to the Adversary for even if Debtor could succeed in avoiding the sheriff's sale, he simply does not have the ability or the intention to pay ABN from his Plan Funds. As apparent from the background of this case, Debtor's testimony and representations to this Court have repeatedly been untruthful. In December 2005 he represented that he had been deprived of purchasing the Property at sheriff's sale and accordingly was given 30 days to do so which he stated was sufficient.

---

[7] The adversary case was erroneously dismissed and Debtor has filed a motion to reconsider the dismissal. He would be entitled to such an order if this matter did not become moot by reason of the dismissal of the main case.

Thirty days later, he had not paid ABN because he had no money, evidencing that he could not have purchased the Property at the sale even if his bid had been recognized. Yet he presses the Adversary on this "irregularity." In January, he stated that he had the funds in the Plan but was unaware that he could not access them quickly. He claimed to have started the process by submitting the required hardship letter on December 21. A copy of the letter has never been produced. At the hearing on March 30, he now states that he submitted the documents in <u>February</u>, again copies of the relevant documents are not produced. Thus at the prior hearing, his testimony was simply false on this issue. When pressed on that inconsistency, he acknowledges that in January he was pursuing refinancing and the "deferred compensation was the last thing he wanted to do."

The present record informs me that liquidating the Plan Funds is still the last thing Debtor wishes to do. While a letter from the Plan administrator acknowledges that as of March 29, 2006 he has a pending application for an UEW, Debtor does not appear to have informed the Plan administrator that he does not own the Property, having lost it in foreclosure. On the other hand, there is evidence that he affirmatively misrepresented his ownership of the Property to the insurance broker, Exhibit D-6, and to Franklin, Exhibit D-8. Thus, while the Chapter 13 Plan states that he will pay ABN with the Plan Funds or a loan, his continual pursuit of a loan when he does not own the Property is, at best, an exercise in denial and at worst, fraud.

Misrepresentation is also apparent in Debtor's bankruptcy documents. As of the date of filing, he represented in sworn schedules that he held $4,000 in Plan Funds. At a hearing

one month later, he testified that he had $80,000 of Plan Funds. Two months later, the Plan administrator acknowledges that $91,000 in Plan Funds which based on the deductions taken from Debtor's pay that he testified to in the earlier hearing, make clear that he understated the value of the Plan Funds. The same manipulation occurred with respect to the value of the Property. Scheduled in his second bankruptcy case filed on March 7, 2005 as worth $40,000, he now attributes a $175,000 value to it in his loan application and bankruptcy schedules. Exhibit D-8. When asked to explain this dramatic increase, he states that he hired an appraiser to provide him with valuation for the application. This seems to be particularly incredible since he claims he had 5-6 pending mortgage applications in January, none of which had materialized.

Aside from Debtor's slippery testimony about the lodging of his application for the UEW and my disbelief that he has provided the necessary documentation, all of which is required,[8] it is apparent from the document that the Plan administrator provided him that Debtor is not eligible to withdraw his money for the intended purpose. As the document makes clear, the Plan allows withdrawals in the event of an unforeseen emergency as defined in section 457 of the Internal Revenue Code ("IRC"). It goes on to state:

> "If the Plan does not comply with the strict definition of unforeseeable emergencies in the IRC, the entire plan could be deemed to be ineligible. If that were to occur, ALL Plan Participants could be taxed on their entire account balance in the Plan. Therefore, although the Plan realizes that

---

[8] Indeed the form states as follows:

**!!!!!! ALL MATERIALS ON THIS LIST ARE REQUIRED!!!!!!
!!!!!!!!!!!!!!!NO EXCEPTIONS!!!!!!!!!!!!!!!!!!!!**

-8-

> emergencies do occur and wishes to help, each situation must be carefully reviewed for compliance with the IRC to protect the tax-deferred status of the assets in the entire plan.

Exhibit D-7 at 1 (unnumbered). In a list of Commonly Asked Questions and Answers that follows, an "unforeseen emergency" was defined to mean a "severe financial hardship resulting from (1) a sudden and unexpected illness or accident; (2) the loss of property due to a casualty; and (3) any other extraordinary and unforeseen circumstance arising as a result of events beyond the control of the participant. If this statement was not sufficient in and of itself to make clear that recovery of a property lost at a sheriff sale for failure to pay the mortgage note is not an unforeseen emergency, the examples of excluded situations identified in the document forecloses any possibility that Debtor's application could be granted. The excluded circumstances include, inter alia, purchase of real estate, unpaid rent or mortgage and personal bankruptcy. For all these months, Debtor has been insisting that his Plan Funds are available to fund his Plan. In December he claims to have learned for the first time that he simply could not quickly withdraw the funds. He should have also learned at that time that withdrawals were restricted.[9] His continuing view that the Plan is comparable to a pension or other savings vehicle that can be drawn upon, albeit with penalty, is fantastical.

In order to secure confirmation of a plan, Debtor must prove that he can make all payments under the plan and comply with the plan. 11 U.S.C. § 1325(a)(6). This is commonly known as the "feasibility" requirement. "To satisfy feasibility, a debtor's

---

[9] Having seen Exhibit D-7 on or before the March hearing, one would have thought that Debtor's counsel would have withdrawn the Plan insofar as it was based on a commitment of the Plan Funds which are clearly not available for this purpose.

plan must have a reasonable likelihood of success, i.e., that it is likely that the debtor will have the necessary resources to make all payments as directed by the plan. First National Bank of Boston v. Fantasia (In re Fantasia), 211 B.R. 420, 423 (1st Cir. BAP 1997). As with each of the § 1325 confirmation requirements, the burden is on the debtor to establish that the plan is feasible. Where as here, Debtor has returned to the bankruptcy court for the third time to attempt to confirm a plan, that burden is heightened. In re Newton, 217 B.R. 1002, 1003 (Bankr. S.D. Ohio 1997).

It is apparent that Debtor does not have the resources necessary to make payments under the Chapter 13 Plan.[10] Debtor's proposed sources of payment are more than speculative and uncertain; they are simply non-existent. Debtor cannot secure an emergency withdrawal from the Plan for the totally foreseeable non-emergency of losing his Property upon default of a mortgage that he voluntarily granted.[11] Debtor has no prospects of refinancing the Property as is evident from his lack of success to date even without acknowledging to the prospective lenders that he no longer owns it, and certainly absent ownership, which is unlikely to be recovered through the dubious Adversary, he is legally foreclosed from so doing.[12] Debtor has not met his burden under § 1325(a)(6).

---

[10] Even under the less strict standard articulated by debtor's counsel when he was a bankruptcy judge, i.e., "that the expectations of income are sufficiently realistic that the debtor should be given the opportunity to carry out the plan," In re Capodanno, 94 B.R. 62, 64 (Bankr. E.D. Pa. 1988), Debtor's Plan does not pass muster.

[11] I suspect that part of Debtor's reticence to move forward with the UEW is the fact that the mortgage was given as additional collateral for a loan made to his son.

[12] Debtor's counsel glibly concluded his argument with the opinion that although the Chapter 13 Plan was confirmable, he really did not need the Adversary because ABN would take the money when they get it. If that were so (and it was at the inception of the case), one would have

While I also have considerable doubts about the good faith of this Chapter 13 filing and the Chapter 13 Plan filed in it, this Debtor has already used a disproportionate share of this Court's resources and I feel no need to elaborate at great length on this additional basis for denying confirmation. 11 U.S.C. § 1325(a)(3). It is apparent to me after three evidentiary hearings that Debtor never verified that he had a source of payment to recover the Property and misrepresented his intention and efforts to access a payment source. The Adversary is insignificant for the opposite reason that Debtor's counsel believes it be so – Debtor simply has no resources to fund a plan. Rather it has been used to defer the performance date of the Chapter 13 Plan and to hold ABN hostage to this bankruptcy when it is not the holder of a claim but rather the owner of the Property.

As I find this Chapter 13 Plan unconfirmable and for the foregoing reasons find Debtor unable to propose a feasible plan, any further attempts to file a plan are not permitted. This is especially appropriate where Debtor is a serial filer who has had almost two years to come up with a confirmable plan.[13]

I think it follows from this lengthy narrative that the Motion should be granted. Pursuant to § 1307(c)(5), denial of confirmation under § 1325 and denial of a request for additional time to file another plan or modify the plan is cause for conversion or dismissal. Likewise delay that is prejudicial to creditors is cause for conversion or dismissal under § 1307(c)(1). Aside from the number of years Debtor has obstructed ABN as a bankruptcy

---

thought that Debtor would be out of the woods by now. Given his statement that he applied for UEW in February and processing time is 6- 8 weeks, a decision should have been rendered by now.

[13] Debtor's first Chapter 13 case was filed on July 30, 2004.

debtor, Debtor has had the unfair benefit of occupying ABN's Property since November 1, 2005 without payment, and ABN has had the detriment of being unable to take possession and otherwise deal with its property.

Finally a debtor's lack of good faith in filing is sufficient cause for dismissal under § 1307(c).  In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996).  After losing the Property between bankruptcy cases, Debtor had nothing to lose by making this last ditch, and ultimately futile, effort to get it back on the basis of a dubious legal theory.  The irony is that even if successful in the Adversary crafted by his counsel, he has demonstrated neither the intention or ability to follow through.

An Order consistent with the foregoing Memorandum Opinion shall be entered.

                                              DIANE WEISS SIGMUND
                                              Chief U.S. Bankruptcy Judge

Dated:  May 16, 2006

# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| WARREN L. ELLIS, SR., | : | Bankruptcy No. 05-39345DWS |
| | : | |
| Debtor. | : | |

# ORDER

**AND NOW**, this 16th day of May 2006, upon consideration of (1) the Motion of the Chapter 13 trustee (the "Trustee") to dismiss this Chapter 13 case (the "Motion") and (2) the Debtor's request for confirmation of his Amended Chapter 13 Plan, after notice and hearing and for the reasons set forth in the accompanying Memorandum Opinion;

It is hereby **ORDERED** that:

1. The Motion of the Trustee to dismiss is **GRANTED**.

2. Debtor's request for confirmation of his Amended Chapter 13 Plan is **DENIED**.

DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

<u>Copies to</u>:

David A. Scholl, Esquire
Regional Bankruptcy Center
Law Office of David A. Scholl
#6 St. Albans Avenue
Newtown, PA 19073

Peter J. Mulcahy, Esquire
PHELAN HALLINAN & SCHMIEG, LLP
1617 JFK Boulevard
Suite 1400
Philadelphia, PA 19107

William C. Miller, Esquire
Standing Chapter 13 Trustee
P. O. Box 40119
Philadelphia, PA 19106-0119

Dave P. Adams, Esquire
Office of the U.S. Trustee
833 Chestnut Street
Suite 500
Philadelphia, PA 19107